UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD TOLBERT,<br><br>    Plaintiff,<br><br>  v.<br><br>JOE McGRATH; et al.,<br><br>    Defendants.<br>                                      / | No. C 04-3039 SI (pr)<br><br>**ORDER GRANTING SUMMARY JUDGMENT MOTION** |

**INTRODUCTION**

Edward Tolbert, an inmate at Pelican Bay State Prison, filed this pro se civil rights action under 42 U.S.C. § 1983. Defendants have moved for summary judgment and plaintiff has opposed the motion. For the reasons discussed below, the court concludes that defendants are entitled to judgment as a matter of law on plaintiff's complaint and grants defendants' motion for summary judgment.

**BACKGROUND**

This action concerns Edward Tolbert's placement and retention in administrative segregation ("ad-seg") in Pelican Bay State Prison. The following facts are undisputed, unless otherwise noted.

On June 21, 2003, correctional officer Broadbent was stabbed by inmate Browning outside the Facility B Chapel area, where some inmates were attending a Muslim religious service. Tolbert was among those inmates at the Muslim service. During the attack, several inmates who were attending the Muslim service began to rise from their kneeling positions. Correctional officers interpreted this to be an apparent attempt to join inmate Browning in the attack on correctional officer Broadbent. Correctional officers were able to stop the inmates before they reached Broadbent.

Tolbert does not dispute that several inmates at the service began to rise, but urges that they did so for reasons different from those urged by defendants. Tolbert states that, when an alarm sounds, inmates are instructed to exit the chapel and go to a designated spot to await further instructions. However, he offers no evidence that such instructions were given on the date in question. He also states that "it is a prison-mentality instinct to go on the alert against possible attacks when something happens near-by. Several Muslim inmates, caught by the surprise of an alarm and attack in their vicinity, began to get up to exit the chapel area while being cautious of their surroundings." Plaintiff's Statement Of Disputed Factual Issues, p. 2.

After the attack, investigators learned that an inmate had attempted to warn a staff member about the attack by leaving a letter for that staff member earlier in the day. The letter informed the staff that inmates who were part of a group known as Ansar El Muhammed (AEM) were planning an attack. The staff member for whom the letter was left was not on duty to receive the letter in time to avoid the attack.

Five days after the attack, Tolbert was put in ad-seg and received an ad-seg lock-up notice (CDC-114 form). The June 26 ad-seg lock-up notice stated Tolbert was placed in ad-seg "pending investigation of conspiracy to murder a peace officer. Conspiracy to murder a peace officer is an offense [for] which a SHU term may be assessed. Therefore you are deemed a threat to the safety and security of this institution if you were to remain in the general population." Complaint, Attach. B. An Institutional Classification Committee ("ICC") hearing was held on July 2, 2003.

Defendant Polk described the reason Tolbert was chosen for ad-seg placement during the investigation of the stabbing and alleged conspiracy:

> Following the incident, investigators put together a list of inmates, based in part on information from confidential informants, whom they believed were part of the AEM. The AEM is a group of Black Muslims, many of whom have ties to violent street gangs. Inmate Tolbert was among the inmates on the list of AEM members, and this information was made available to me and others who took part in the decision to segregate inmate Tolbert during the investigation.

Polk Decl., ¶ 6.[1]  Tolbert states that he was told at the ICC hearing "that the Muslim service sign-up sheet was utilized to identify Muslim inmates." Tolbert Decl. in Opposition, ¶ 8.

Although Tolbert does not dispute defendants' description of the AEM's gang roots, he states that he "is not aware of any religious affiliations to Islam." Plaintiff's Statement Of Disputed Factual Issues, p. 2. Tolbert also urges that he did not qualify for membership in the AEM because he was from the Crips gang. Due to the antagonism between the Bloods and Crips gangs, "plaintiff simply cannot be apart [sic] of the 'AEM' because of a past affiliation with a Crip organization." Id. at 3. Tolbert offers no evidence of a public charter of the AEM and does not explain how he is competent to describe the AEM's membership criteria. Evidence submitted under seal indicates that the AEM does not exclude inmates who were in the Crips gang; to the contrary, the AEM considers Crips inmates to be potential recruits.

Periodic reviews of Tolbert's ad-seg placement were conducted. On September 24, 2003 and December 3, 2003, the ICC determined that Tolbert would be kept in ad-seg.

In November 2003, information received from a confidential informant indicated that Tolbert likely had advance notice of the planned attack on Broadbent. The confidential document filed under seal described inmate activity surrounding the attack and Muslim service that day. The document explained that persons at the Muslim service were privy to the plan to stab the correctional officer.

Once investigators determined that Tolbert was no longer a focus of the investigation into

---

[1] According to information later received from at least one confidential informant, the AEM is a group of Black Muslims with prior affiliations in street gangs such as the "Bloods" and the "415s." The AEM has a very structured ranking and disciplinary system. In the past, the group has planned assaults on both inmates and peace officers.

3

the attempted murder, Tolbert was released from ad-seg on January 7, 2004.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is properly granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson, 477 U.S. at 248.  When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

4

plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The complaint here has a verification section that, liberally construed, amounts to a statement that the complaint is made under penalty of perjury. The complaint therefore is part of the evidence that will be considered.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

**DISCUSSION**

A.   Due Process Claim

Tolbert claims that his placement in ad-seg violated his right to due process, focusing on the sufficiency of the evidence to support the decision to place him in ad-seg.

The Due Process Clause of the Fourteenth Amendment protects individuals against governmental deprivations of life, liberty or property without due process of law. Changes in conditions of confinement for a prison inmate may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of real substance. Sandin v. Conner, 515 U.S. 472, 477-87 (1995). When prison officials initially determine whether a prisoner is to be segregated for administrative reasons and a liberty interest of real substance is implicated, due process requires that they hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, inform the prisoner of the charges against him or the reasons segregation is being considered, and allow the prisoner to present his views. Toussaint v. McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986), cert. denied, 481 U.S. 1069 (1987). Due process also requires that there be an evidentiary basis for the prison officials' decision to place an inmate in segregation for administrative reasons. Superintendent v. Hill, 472

5

U.S. 445, 455 (1985); Toussaint, 801 F.2d at 1104-05. This standard is met if there is "some evidence" from which the conclusion of the administrative tribunal could be deduced. Hill, 472 U.S. at 455; Toussaint, 801 F.2d at 1105.

Tolbert was placed in ad-seg on June 26, 2003. Within a week, on July 2, 2003, he had a hearing before the ICC. At this hearing, the ICC determined that it was necessary for Tolbert to remain in ad-seg pending completion of the investigation into the attempted murder of Broadbent. Tolbert participated in the hearing and stated he understood the committee's action. Tolbert received the CDC-114 lockup notice the day he was placed in ad-seg, was granted a hearing within a reasonable time after his placement in ad-seg, was informed of the charges against him, and was permitted to voice his views. The ICC procedures followed by prison staff did not violate Tolbert's due process rights.

Tolbert alleges that there was not sufficient evidence to place him in ad-seg and his due process rights were thus violated by his segregation. The relevant question in evaluating this claim is whether "there is any evidence in the record that could support the conclusion" reached by the officials to place Tolbert in ad-seg. Hill, 472 U.S. at 455-456. Decisions supported by any evidence are not "subject to second guessing upon review." Id. at 455.

Tolbert's placement in ad-seg was based on "some evidence" and furthered legitimate penological goals of security in Pelican Bay. There was sufficient evidence for officials to suspect Tolbert's involvement in the attempted murder. At the time of the attack, it appeared to prison officials that several inmates attending the service were attempting to join Browning in the stabbing. It is not clear whether all, or less than all, of the inmates attending the service attempted to aid Browning.[2] However, there is some evidence that inmates present at the service were privy to, and attempted to contribute to the attack. Segregating inmates who were present at the service, including Tolbert, served a legitimate penological interest of maintaining safety until the investigation had been completed.

---

[2] Neither Tolbert nor defendants describe how many inmates were at the service, how many began to rise from their kneeling positions, or how many were put in ad-seg.

More importantly, there was some evidence that the attack on Broadbent was planned by the AEM, of which Tolbert was thought to be a member based on confidential information that the staff had. There was some evidence that Browning did not act alone and that other prisoners were involved in the planning and perpetration of the attempted murder. This was sufficient evidence to justify Tolbert's placement in ad-seg during the investigation. Tolbert's segregation promoted prison safety by ensuring that a potential participant in the attempted murder was unable to collaborate or pose further harm to staff and other inmates while investigations were pending.

Tolbert's placement in ad-seg was the type of placement contemplated by the Court in Hewitt v. Helms, 459 U.S. 460, 473-74 (1983), where the Court recognized the occasional need to segregate inmates during investigations in prison and recognized that numerous factors may inform prison officials' determinations as to the severity of a security threat. The Court held that an informal non-adversary review of the evidence satisfied due process for an inmate placed in ad-seg during investigation of an outbreak of violence at the prison. "In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on 'purely subjective evaluations and on predictions of future behavior.'" Id. at 474. There is no evidence here that ad-seg was "used as a pretext for indefinite confinement" of Tolbert. See id. at 477 n.9. During the investigation, officials received information that suggested Tolbert was connected to the stabbing, although he eventually was released after officials later determined that the investigation had concluded and Tolbert was "no longer a focus of the investigation." Patterson Decl., Exh. 6.

Tolbert makes several points to attempt to show the lack of evidentiary support for the decision to place him in ad-seg. First, he contends that he could not have been in the AEM because he was from the Crips gang. This contention is unpersuasive because Tolbert has not offered any competent evidence that AEM excluded Crips gang members and defendants offered evidence that

7

showed that AEM considers inmates from the Crips gang to be potential recruits. Tolbert has not raised a triable issue of fact that it was not possible for him to be in AEM.

Tolbert also urges that the November 2003 confidential memorandum could not be the basis for his placement in ad-seg because it was not prepared until four months after his placement. This is correct but irrelevant because defendants do not argue that the placement was based on that confidential memorandum. Other confidential information was used to place and keep Tolbert in ad-seg. See Complaint, attachment F (CDC-1030 Confidential Information Disclosure Form dated August 25, 2003, stated that information had been obtained from confidential memoranda dated June 26, 2003, and July 8, 10, 15, and 16, 2003). Tolbert knew even before the CDC-1030 form was issued that confidential information had been used, as evidenced by the fact that he had complained in an August 7, 2003 inmate appeal about the use of "unsubstantiated confidential information" to place him in ad-seg. Complaint, attachment A. Tolbert points to his lock-up order as evidence that there was no confidential information used in the initial placement. The relevant portion of the CDC-114 states: "❏ if confidential information used, date of disclosure: __/__/__." Complaint, attachment B. Tolbert argues that "nothing is marked in [the confidential information] box because no confidential information had been used." Plaintiff's Brief In Opposition, p. 4. The absence of a notation that confidential information was used for the lock-up order is not enough to create a triable issue of fact that defendants had no confidential information at the time they placed him in ad-seg. He concedes he was told at the time of placement that he was placed in ad-seg for his "possible involvement in an attack on a correctional officer." Tolbert Decl., ¶ 4; Complaint, ¶ 9.

Tolbert also argues that, because he was eventually cleared of involvement and released, he never should have been put in ad-seg. This argument misunderstands the nature of his placement in ad-seg. One need not be a wrongdoer to be put in ad-seg during an investigation, as Hewitt explained. Even if one is suspected of being a wrongdoer, the fact that he is later exonerated does not prove that the earlier suspicion was unwarranted.

Tolbert has failed to show a triable issue of fact on his claim that he was not afforded due

8

1  process when he was placed in ad-seg. Defendants are entitled to summary judgment on this claim.

3  B.    Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)). When challenging his treatment with regard to other prisoners, a prisoner must show that his treatment is invidiously dissimilar to that received by other inmates. A prison classification based on race is immediately suspect and is subject to the same strict scrutiny as a racial classification outside prison; prison officials must therefore demonstrate that the race-based policy or action is narrowly tailored to serve a compelling state interest. See Johnson v. California, 125 S. Ct. 1141, 1148-49 (2005) (race-based cell assignment policy). For distinctions drawn among prisoners other than those based on race, strict scrutiny is inappropriate to test the infringement of prisoners' constitutional rights. Turner v. Safley, 482 U.S. 78, 89 (1987); see Johnson, 125 S. Ct. at 1148-49. Where a prison regulation (other than a race-based one) impinges on inmates' constitutional rights, the regulation or practice is valid if it is reasonably related to legitimate penological interests. See Turner, 482 U.S. at 89. In short, a race discrimination claim is analyzed under a strict scrutiny standard and a religious discrimination claim analyzed under the less restrictive Turner standard.

The inmate making an equal protection claim must demonstrate discriminatory intent or purpose by the defendants. See Washington v. Davis, 426 U.S. 229, 239-40 (1976); Jeffers v. Gomez, 267 F.3d 895, 913-14 (9th Cir. 2001) (reversing denial of summary judgment based on qualified immunity on claim that prison guard targeted black inmates while shooting to quell prison riot; because plaintiff alleged only that defendant shot at him, it was irrelevant that all but one of the inmates shot and all inmates suffering serious stab wounds in Hispanic-black riot were black). Where a policy is suspect on its face (e.g., a policy explicitly based on race), the plaintiff

9

need not prove discriminatory intent or impact. See Walker v. Gomez, 370 F.3d 969, 973-74 (9th Cir. 2004).

Tolbert has failed to raise a triable issue of fact that he was subjected to religious or race discrimination. The only evidence in support of the discrimination claim is from Tolbert's own mouth, and he describes it quite vaguely by omitting reference to the speaker's identity or the speaker's particular words. Tolbert's evidence consists of these statements by him: "I was told at my initial classification that the Muslim services sign-up sheet was utilized to identify Muslim inmates." Tolbert Decl., ¶ 8. "[P]laintiff was personally told during his initial classification that the security squad used the Muslim service sign-up sheet as a guide to place inmates into administrative segregation." Plaintiff's Statement Of Disputed Factual Issues, p. 2. "Because the plaintiff was on the Muslim service attendance list, he was deemed a threat to the security of the institution. Because he was classified to the Black ethnic group, he was deemed a threat to the security of the institution. Other non-Black inmates on the Muslim attendance sheet were not locked up." Complaint, p. 5. Tolbert does not state who told him this information, how big a part of the decision the Muslim service sign-up sheet played in the ad-seg decision, whether there actually were any non-Black Muslims at the service, and whether anyone not at the service was put in ad-seg.

Even accepting Tolbert's evidence as true, it does not establish or support an inference that either of the defendants discriminated against him. Tolbert did not provide evidence that either defendant made the statement that he contends shows discrimination and did not provide evidence that either defendant adopted or failed to repudiate that statement.

Tolbert also fails to raise a triable issue of fact that he was treated differently from other inmates because he was a Muslim, even if one accepts as true that the Muslim service list was consulted by the ICC. Tolbert alleged in his complaint that "[n]o inmates from the Christian or Catholic services were targeted," Complaint, p. 6, but fails to provide any evidence showing the existence of similarly situated inmates that might make his Muslims-were-treated-differently argument persuasive. Specifically, there is no evidence that the stabbing occurred near a Christian

10

or Catholic service, there is no evidence that there was even a Christian or Catholic service in progress at the time of the stabbing, and there is no evidence that prison officials had any information that AEM or the assailant or the stabbing had any connection to a Christian or Catholic inmate group. Tolbert also provides no evidence of any other incident where prison officials had information that an inmate group whose membership was restricted to Christians and Catholics had planned the attack on a guard but chose not to put inmates in those groups in ad-seg. Prison officials had access to information that showed at least a potential connection between the stabbing and the inmates at the Muslim service that day: the stabbing happened outside the chapel, the stabbing was done by an inmate on the chapel service list,[3] and inmates in the chapel began to rise in what appeared to officials to be taking steps to aid in the attack.

Tolbert also has failed to show a triable issue of fact that his placement in ad-seg was based on race because he has not shown similarly-situated inmates being treated differently. He offered no evidence that prison officials had any information that connected non-Black inmates to the AEM. He has not shown that similarly situated non-Black inmates were not placed in ad-seg. For example, he has not shown that prison officials suspected non-Black inmates of being connected to the attack or to AEM and has not shown that prison officials placed any Black inmates in ad-seg who were not believed to be part of AEM. Tolbert apparently tries to support his race discrimination claim by urging that he could not have been in AEM because he had been in the Crips gang and the AEM was made up of only Bloods and 415 gang members; however, as explained earlier, he has not provided any competent evidence that inmates who had been in the Crips gang were precluded from joining the AEM.

When a conspiracy exists and limits its membership to persons of a particular race and religion, that conspiracy cannot be insulated from scrutiny by crying foul when the people investigated share the characteristics required by the conspiring group for membership in it. Here, the undisputed evidence shows that prison officials were investigating an attack connected to a

---

[3] In his State Board of Control claim, Tolbert wrote that "an inmate who I do not know stab a correctional office while attending Islamic services to wich I was the Islamic clerk." Complaint, attachment D, third page (spelling errors in source).

11

prison group whose membership was limited to Black Muslims. Even if one accepts as true the statement that some prison official told Tolbert that the Muslim service attendance list had been used in determining who would be placed in ad-seg, that does not itself show or support an inference of discriminatory purpose or intent under the particular circumstances.

Tolbert has not presented evidence sufficient to overcome defendants' showing that his placement in ad-seg was based on his perceived membership in the AEM and connection to the stabbing rather than because he was Black or Muslim. There is no genuine issue of material fact on Tolbert's equal protection claim. On the undisputed evidence, defendants are entitled to summary judgment.

C.  Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Saucier v. Katz, 533 U.S. 194, 202 (2001) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The evidence in the record establishes that Tolbert's rights under the Fourteenth Amendment's Due Process Clause and Equal Protection Clause were not violated. Defendants therefore are entitled to prevail as a matter of law on their defense of qualified immunity to the § 1983 claims. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known); Saucier v. Katz, 533 U.S. 194, 201 (2001) (threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 31.) Judgment will be entered in defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: December 6, 2005

_____
SUSAN ILLSTON
United States District Judge